UNITED STATES, Appellee

v.

Samuel A. WICKS, Technical Sergeant
U.S. Air Force, Appellant

No. 13-6004

Misc. App. No. 2013-08

United States Court of Appeals for the Armed Forces

Argued October 22, 2013

Decided February 20, 2014

BAKER, C.J., delivered the opinion of the Court, in which
ERDMANN and RYAN, JJ., and COX, S.J., joined.  STUCKY, J., filed
a separate opinion concurring in part and dissenting in part.

<u>Counsel</u>

For Appellant:  Captain Christopher D. James (argued); Major Ja
Rai A. Williams (on supplement).

For Appellee:  Major Charles G. Warren (argued); Major Tyson D.
Kindness and Gerald R. Bruce, Esq. (on answer).

Amicus Curiae for Appellant:  Anthony Pellegrini (law student)
(argued); D'lorah L. Hughes, Esq. (supervising attorney) (on
brief) – of the University of Arkansas School of Law.

Amicus Curiae for Appellee:  Jonathan Brown (law student –
University of Arkansas School of Law) (argued); Duane A. Kees,
Esq. (supervising attorney) (on brief).

Military Judge:  Donald R. Eller Jr.

**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

Chief Judge BAKER delivered the opinion of the Court.

This case arises out of an interlocutory appeal under Article 62, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 862 (2012), in a pending court-martial. Appellant was charged with four specifications of violating general regulations pursuant to Article 92, UCMJ (one of which was later dismissed); one specification of committing indecent conduct pursuant to Article 120, UCMJ; and one specification of impeding an investigation pursuant to Article 134, UCMJ.[1] These specifications were referred to trial by general court-martial. Trial defense counsel subsequently filed a motion to suppress evidence obtained from Appellant's cell phone and related derivative evidence. Upon conducting a preliminary hearing, the military judge granted the defense motion and suppressed the evidence. Trial counsel immediately requested reconsideration of the ruling, which the military judge upheld while providing findings on the record. Specifically, the military judge noted in his findings that the Government "failed to satisfy its burden as required under [Military Rule of Evidence (M.R.E.)] 311." He continued that the "evidence that is the result of the cell phone analysis and all derivative evidence is inadmissible and suppressed as there were repeated violations of the

_____

[1] With the consent of both parties, oral argument was held at the University of Arkansas School of Law in Fayetteville, Arkansas, on October 22, 2013, as part of the Court's Project Outreach.

accused's rights in that he had a reasonable expectation of privacy in his phone which was stolen." Upon the Government's Article 62, UCMJ, appeal, the United States Air Force Court of Criminal Appeals (CCA) vacated the military judge's decision. Appellant then filed his timely appeal to this Court.[2]

This case presents a series of Fourth Amendment questions, including some of first impression for this Court. The first question is whether Appellant possessed a reasonable expectation of privacy in his cell phone. The next question is whether there was a Fourth Amendment search of Appellant's cell phone and, if so, whether the search was lawful. The third and final inquiry is whether the exclusionary rule should apply to the evidence.

Based on the analysis below, we hold that the military judge did not err in concluding that the Government's search of Appellant's cell phone violated Appellant's reasonable expectation of privacy, thus rendering the evidence obtained from the cell phone inadmissible.

---

[2] The petition for grant of review was granted on this issue:

> Whether the Air Force Court of Criminal Appeals erred by finding law enforcement's repeated warrantless searches of Appellant's iPhone did not violate the Fourth Amendment.

United States v. Wicks, 72 M.J. 454 (C.A.A.F. 2013) (order granting review).

BACKGROUND

Appellant was a military training instructor (MTI) assigned to Joint Base San Antonio-Lackland, Texas. His duties included training new recruits. While at the base, Appellant was involved in a personal relationship with Technical Sergeant (TSgt) Ronda Roberts, also a MTI assigned to Lackland. In November 2010, while Appellant was sleeping, TSgt Roberts viewed text messages on his cell phone without his permission. She testified that she saw "disturbing text messages," but the record did not elaborate much further. By December 2010, TSgt Roberts and Appellant had ended their relationship.

Several months later, in May 2011, TSgt Roberts took Appellant's cell phone from the Charge of Quarters (CQ) area without his permission while Appellant was on duty. She later testified that she did this because she thought Appellant was acting inappropriately and because she was angry with him. Appellant noticed his cell phone was missing and tried to find it. Both Appellant and TSgt Roberts's supervisor asked TSgt Roberts if she had seen the cell phone, but she lied and answered in the negative. Appellant continued searching for his cell phone and sent an e-mail to members of his squadron alerting them to his missing cell phone. Later that day, in the privacy of her home, TSgt Roberts read through various text messages and noticed several communications between Appellant

4

and women whom she believed were trainees based on their initials and pictures. She testified that she believed they were trainees based on their "faces look[ing] real familiar." TSgt Roberts also saw a sexually explicit video of a man masturbating -- whom TSgt Roberts believed to be Appellant -- which was sent to a former trainee.

TSgt Roberts did not tell anyone that she had stolen Appellant's phone and went on leave shortly thereafter. Upon returning from leave nearly three weeks later, TSgt Roberts confronted Appellant with what she had seen on the cell phone but without mentioning that she had stolen the cell phone from him. According to the testimony of TSgt Roberts, she advised Appellant that she thought his behavior was inappropriate. TSgt Roberts stated that in response, Appellant acknowledged sending text messages to recruits, but told her to "[g]et out of [his] face."

On January 10, 2012, nearly eight months after TSgt Roberts took Appellant's cell phone and in response to a general inquiry from the command regarding whether anyone had information on MTI misconduct, Detective Rico from the Security Forces Office of Investigations (SFOI) interviewed TSgt Roberts. During this interview, TSgt Roberts told Detective Rico she had evidence that could prove Appellant had inappropriate relationships with trainees. Prior to this interview, SFOI did not suspect

5

Appellant of engaging in MTI misconduct.  Although TSgt Roberts did not supply the cell phone at that meeting, TSgt Roberts provided verbal descriptions of the text messages she had seen. For example, the military judge determined that TSgt Roberts shared partial names of women -- Wade and Benoit -- with whom she thought Appellant was having a relationship.  After this first interview -- but before receiving the cell phone -- Detective Rico consulted with the base legal office.  She also secured recruit flight rosters for the preceding five years to search for potential trainees with the same last name or initials as those mentioned by TSgt Roberts.  This was the first of three times that Detective Rico sought advice from the legal office.

On January 11, 2012, TSgt Roberts provided a SIM card to Detective Rico which Roberts represented to Detective Rico contained information from Appellant's phone that had been downloaded from her iTunes account.  Detective Rico consulted the legal office for a second time and sent the SIM card to the Bexar County Sheriff's Office for analysis.  However, the analysis revealed that the SIM card did not contain any information.  Detective Rico informed TSgt Roberts about this development.  TSgt Roberts testified that Detective Rico then urged TSgt Roberts to find the evidence and give it to her, and that Detective Rico "put pressure on me to provide them

evidence." On January 17, 2012, TSgt Roberts returned to SFOI and provided a phone to Detective Rico. According to Detective Rico, TSgt Roberts represented that the phone belonged to an unnamed airman but contained information downloaded from Appellant's cell phone via her iTunes account.

After TSgt Roberts gave Detective Rico the cell phone, Rico did not ask Roberts to show her the text messages she had previously seen. Instead, after receipt of the phone, Detective Rico reviewed some text messages by scrolling through the cell phone. TSgt Roberts was not present during this search. Detective Rico then turned the cell phone over to the Bexar County Sheriff's Office for analysis on January 18, 2012. SFOI verbally informed the Bexar County detective assigned to analyze the cell phone that the search was a consent search. However, Detective Rico did not ask TSgt Roberts to complete paperwork related to consent for search, nor did she seek a search authorization. At the request of SFOI, the Sheriff's Office "hit[] the entire phone," extracting all the information and copying it onto a disk.

The Bexar County analysis indicated that Appellant's information was the only data on the cell phone. At this point, Detective Rico said she felt "uncomfortable" with the steps taken and thought it "odd" that the phone only contained Appellant's data. Detective Rico -- for the third time --

7

consulted the legal office and informed them about the amount of information on the cell phone. According to Detective Rico, there was still no discussion of a need for a search warrant. Subsequently, SFOI sent Appellant's cell phone to a third-party vendor -- Global CompuSearch -- on March 28, 2012, for a more comprehensive forensic analysis.

Detective Rico also interviewed former trainees whom she suspected had personal relationships with Appellant, based on her interview of TSgt Roberts, and data from Appellant's cell phone from Bexar County. Specifically, she interviewed Senior Airman (SrA) Benoit. The interview was conducted with the benefit of text messages exchanged between Appellant and SrA Benoit extracted from Appellant's cell phone. During the interview, SrA Benoit confirmed what Detective Rico knew from the text messages. But SrA Benoit also testified that she had not planned on disclosing or discussing the details of her relationship with Appellant prior to Detective Rico's interview. She also indicated that Appellant had called her nine months prior to the interview (circa May/June 2011) to tell her that someone took his cell phone and to encourage her to deny that she had any contact with Appellant after graduation, even though she had maintained contact with Appellant for about two months after graduation.

In November 2012, TSgt Roberts admitted that the cell phone she provided to Detective Rico was actually Appellant's cell phone. In response, Detective Rico advised Roberts of her rights with reference to the cell phone theft. Finally, in February 2013, during the pendency of Appellant's suppression motion and at the request of trial counsel, Global CompuSearch analyzed Appellant's cell phone including searching over 45,000 text messages to extract the texts relevant to the investigation. Trial counsel used the results of this examination to argue the Government's motion for reconsideration of the military judge's initial suppression ruling.

In summary and in accordance with the military judge's findings, there were three Government searches:  the search by Detective Rico, the search by Bexar County, and the search by Global CompuSearch.[3]  The first Government search of the cell

---

[3] In reviewing the record, we found a total of six searches of Appellant's cell phone data by various parties. The first search occurred in November 2010 when TSgt Roberts examined Appellant's cell phone while he was sleeping and looked at the contents of the cell phone. The military judge found that "TSgt Roberts was acting in her private capacity at the time she reviewed the phone." Next, in May 2011, TSgt Roberts once again searched Appellant's cell phone after she stole it from him from the CQ desk. Third, Bexar County searched Appellant's SIM card provided to them by Detective Rico on January 11, 2012. The military judge concluded that Bexar County's "analysis of the SIM card revealed that no information was resident on the card." Fourth was Detective Rico's search of Appellant's cell phone which she received from TSgt Roberts. The fifth search was on January 18, 2012, when the Government sent the phone for analysis by the Bexar County Sheriff's Office. The sixth and

phone occurred on January 17, 2012, when Detective Rico received Appellant's cell phone from TSgt Roberts. In his findings, the military judge noted that after TSgt Roberts left, Detective Rico "turned on the cell phone and reviewed [the] text messages." The military judge concluded that this review was "not conducted while TSgt Roberts was present" nor did Detective Rico "mirror the actions taken by TSgt Roberts." Accordingly, the military judge found that Detective Rico "engaged in a general search of the cell phone." The second Government search was on January 18, 2012, when Bexar County conducted a comprehensive analysis of the cell phone. The military judge also determined that these "results were used as a basis for further computer forensic examination by Global CompuSearch and used by SFOI personnel in conducting further investigation into the accused." The third and final Government search was when Global CompuSearch searched over 45,000 text messages in February 2013 and provided this data -- at the behest of the Government -- for use in its motion for reconsideration.

### STANDARD OF REVIEW

In an Article 62, UCMJ, petition, this Court reviews the military judge's decision directly and reviews the evidence in the light most favorable to the prevailing party at trial.

---

final search was when the Government sent the phone to Global CompuSearch.

United States v. Baker, 70 M.J. 283, 287–88 (C.A.A.F. 2011).
"'In reviewing a military judge's ruling on a motion to
suppress, we review factfinding under the clearly-erroneous
standard and conclusions of law under the de novo standard.'"
Id. at 287 (quoting United States v. Ayala, 43 M.J. 296, 298
(C.A.A.F. 1995)).  We apply this standard when reviewing
evidentiary rulings under Article 62(b), UCMJ.  Therefore, on
mixed questions of law and fact, a military judge "abuses his
discretion if his findings of fact are clearly erroneous or his
conclusions of law are incorrect."  Ayala, 43 M.J. at 298.  The
abuse of discretion standard calls "'for more than a mere
difference of opinion.  The challenged action must be arbitrary
. . . , clearly unreasonable, or clearly erroneous.'"  United
States v. White, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting
United States v. Lloyd, 69 M.J. 95, 99 (C.A.A.F. 2010))
(internal quotation marks omitted).

ANALYSIS

A.  The Fourth Amendment and Core Principles

Our analysis starts with the text of the Fourth Amendment.
The Fourth Amendment of the U.S. Constitution protects "the
right of the people to be secure in their persons, houses,
papers, and effects, against unreasonable searches and
seizures."  U.S. Const. amend. IV.  Whether a search is
reasonable depends, in part, on whether the person who is

11

subject to the search has a subjective expectation of privacy in the object searched and that expectation is objectively reasonable. Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); see also United States v. Runyan, 275 F.3d 449, 457 n.9 (5th Cir. 2001). In Katz, for example, the Supreme Court recognized that the Fourth Amendment protects privacy interests outside the home and directly associated with the person, in that case, a person taking bets in a public telephone booth. Katz, 389 U.S. at 359.

The Fourth Amendment further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A search that is conducted pursuant to a warrant is presumptively reasonable whereas warrantless searches are presumptively unreasonable unless they fall within "a few specifically established and well-delineated exceptions." Katz, 389 U.S. at 357. "Where the government obtains evidence in a search conducted pursuant to one of these exceptions, it bears the burden of establishing that the exception applies." United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000); see also M.R.E. 311; Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971) ("[T]he burden is on those seeking the exemption to show the need for it.") (quotation marks and citations omitted). See

12

generally 42 Geo. L.J. Ann. Rev. Crim. Proc. 46–47 & nn. 106-14 (2013) (surveying warrantless search and seizure cases in the Supreme Court and federal courts of appeals); M.R.E. 314. In this case, the Government proceeded without a warrant or search authorization.

B. Cell Phones and Reasonable Expectations of Privacy

Applying these principles, we hold that the military judge did not err as a matter of law in determining that Appellant had a reasonable expectation of privacy in his cell phone and that his expectation was objectively reasonable. To begin, every federal court of appeals that has considered the question of cell phone privacy has held there is nothing intrinsic about cell phones that place them outside the scope of ordinary Fourth Amendment analysis. See, e.g., United States v. Wurie, 728 F.3d 1, 8-9 (1st Cir. 2013), cert. granted, 82 U.S.L.W. 3424 (U.S. Jan. 17, 2014) (No. 13-212); United States v. Flores-Lopez, 670 F.3d 803, 805-06 (7th Cir. 2012); United States v. Murphy, 552 F.3d 405, 411 (4th Cir. 2009); United States v. Zavala, 541 F.3d 562, 577 (5th Cir. 2008); see also United States v. Yockey, No. CR09-4023-MBW, U.S. Dist. LEXIS 67259, at *7-*8, 2009 WL 2400973, at *3 (N.D. Iowa Aug. 3, 2009) (citing federal appellate and district courts in stating that "[a] search warrant is required to search the contents of a cell phone unless an exception to the warrant requirement exists").

13

This conclusion is unremarkable.  From the perspective of Katz, a cell phone used as a communications device is like a portable phone booth albeit with modern media capacity.  Modern cell phones can also serve as an electronic repository of a vast amount of data akin to the sorts of personal "papers[] and effects" the Fourth Amendment was and is intended to protect. "The papers we create and maintain not only in physical but also in digital form reflect our most private thoughts and activities."  United States v. Cotterman, 709 F.3d 952, 957 (9th Cir. 2013).  Today, individuals "store much more personal information on their cell phones than could ever fit in a wallet, address book, briefcase, or any of the other traditional containers."  Wurie, 728 F.3d at 9.

Therefore, cell phones may not be searched without probable cause and a warrant unless the search and seizure falls within one of the recognized exceptions to the warrant requirement. See Wurie, 728 F.3d at 8-9; see also Flores-Lopez, 670 F.3d at 805-06.  Here no exception applied.  Thus, the question becomes did TSgt Roberts's search of Appellant's cell phone frustrate Appellant's Fourth Amendment right of privacy such that one or more of the subsequent Government searches were lawful?

C.  Private Search Doctrine and Its Limits

Before this Court, the Government argues that the military judge erred in applying the private search doctrine to this

14

case.  The Government does not dispute that TSgt Roberts acted in a private capacity when she searched Appellant's phone. However, it argues, as the CCA concluded, that subsequent Governmental searches did not materially exceed the scope of the original private search and that any remaining expectation of Appellant's privacy was not violated by the Government's subsequent search because TSgt Roberts's private search had already frustrated that expectation.

The private search doctrine is based on the well-established principle that the Fourth Amendment and its antecedent case law-derived search and seizure rules do not apply to searches conducted by private parties.  United States v. Jacobsen, 466 U.S. 109, 113-14 (1984).  As such, once a private party has conducted a search, any objectively reasonable expectation of privacy a person may have had in the material searched is frustrated with respect to a subsequent government search of the same material.  See United States v. Reister, 44 M.J. 409, 415–16 (C.A.A.F. 1996) (concluding that government was not restrained from using information obtained from a private party's search of the appellant's logbook and notes because the original expectation of privacy was frustrated); United States v. Portt, 21 M.J. 333, 334 (C.M.A. 1986) (upholding government's warrantless search of an unlocked locker as valid where private party had already searched contents).

However, there are two essential limits to this doctrine. First, the government cannot conduct or participate in the predicate private search. Specifically, "[t]o implicate the Fourth Amendment in this respect, there must be 'clear indices of the Government's encouragement, endorsement, and participation' in the challenged search." United States v. Daniels, 60 M.J. 69, 71 (C.A.A.F. 2004) (quoting Skinner, 489 U.S. at 615–16). There is no bright line test as to when the government involvement goes too far, rather, courts have relied on the particular facts of particular searches to make this determination. See United States v. Steiger, 318 F.3d 1039, 1045 (11th Cir. 2003) ("A search by a private person does not implicate the Fourth Amendment unless he acts as an instrument or agent of the government."); United States v. Jarrett, 338 F.3d 339, 344 (4th Cir. 2003); United States v. Hall, 142 F.3d 988, 993 (7th Cir. 1998).

The second limitation on the private search doctrine pertains to the scope of any subsequent Government search. The government may not exceed the scope of the search by the private party, including expansion of the search into a general search. Jacobsen, 466 U.S. at 115, 117-18. This rule is based on the theory behind the private search doctrine. Once the "frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-

16

nonprivate information" unless the government uses information for which the expectation of privacy has not already been frustrated. Id. at 117. Thus, the "additional invasions of respondents' privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search." Id. at 115.

Applying this to modern computerized devices like cell phones, the scope of the private search can be measured by what the private actor actually viewed as opposed to what the private actor had access to view. See generally Orin S. Kerr, Searches and Seizures in a Digital World, 119 Harv. L. Rev. 531, 548, 556–57 (2005).

This in turn depends partly on how and, perhaps more crucially, whether one analogizes a cell phone to a discrete container. We discuss the container analogy in greater detail in the following section because it formed the basis of the CCA's ruling. Nevertheless, it bears mentioning here as well because the scope of a private party's search can depend on how one categorizes the item being searched. Put another way, if one likens turning on a cell phone to opening a container, then everything within the cell phone would lose its privacy protections where the private party merely turned the phone on before turning it over to the government. Accordingly, the

scope would not be dependent on what was actually viewed but rather what the private actor could have viewed.

In the present case, however, the military judge correctly concluded that what was actually viewed by TSgt Roberts in her search of Appellant's cell phone mattered when determining the scope of subsequent searches. And because the military judge was unable to determine whether Detective Rico limited her search of Appellant's cell phone to the information that TSgt Roberts had previously discovered during her private search, the judge concluded that the Government failed to meet its burden, thus excluding the evidence. Specifically, noting that "Detective Rico was limited in being able to go only as far as the private search of Tech Sergeant Roberts," the military judge concluded that there was "no evidence before this court as to what Tech Sergeant Roberts actually saw." Thus, in the absence of such information, the military judge found that Detective Rico engaged in a "general search at whatever looked interesting" because in reviewing the texts, Detective Rico "did not limit herself to what Tech Sergeant Roberts did," particularly as TSgt Roberts was not present during Detective Rico's search. The military judge further concluded that the Government failed to indicate that they were "acting to respect [Appellant's] constitutional rights" and that this "disregard occurred during the initial search of the SIM card . . . and

18

again when the cell phone was examined by the Bexar County Sheriff's Office and later further examined by Global Compusearch."  In fact, the military judge took particular exception to the Government authorizing Global CompuSearch to analyze and prepare the report on the contents of Appellant's cell phone after his initial ruling that the previous Government searches of the cell phone were in violation of the Fourth Amendment.  This search covered over 45,000 texts which were later collected, sorted, and prepared for presentation and covered not only the text location on the cell phone but also areas where the internal processing inadvertently stored responsive information.  Further, the information presented included texts that would have been viewable by a person in cell phone format as well as "deleted items which would not have been viewable to the normal user."

Thus, in both a material qualitative and quantitative manner, the Government exceeded the scope of the initial private search.  Nor did the Government meet its burden to demonstrate by a preponderance of the evidence that the search of the cell phone was limited to the information provided to the agent by the private person.  "[T]he evidence is unclear as to the extent that Det. Rico's general search may have exceeded the private search conducted by TSgt Roberts."  United States v. Wicks, slip op. at 3 (A.F. Trial Judiciary Feb. 20, 2013) (finding Detective

19

Rico "engaged in a general search"). And although Appellant's expectation of privacy had been frustrated by TSgt Roberts viewing a few text messages and the accompanying video, it was not eliminated altogether; that did not happen until the Government sent the phone for forensic analysis by the Bexar County Sheriff's Office and then by Global CompuServe, thus breaching the remaining portion of Appellant's privacy that had not been frustrated.

These findings support the military judge's conclusion of law that the Government failed to meet its burden that the initial search mirrored TSgt Roberts's private search. Further, the Government's subsequent searches not only exceeded the scope but actually eliminated Appellant's remaining expectation of privacy entirely.

D. Assessing the Container Analysis

As referenced in the preceding section, because the CCA overruled the military judge on the basis of the United States Court of Appeals for the Fifth Circuit's Runyan container analysis, we address it here briefly. In Runyan, the Fifth Circuit determined "that the police [did] not exceed the scope of a prior private search when they examine[d] particular items within a container that were not examined by the private searchers." Runyan, 275 F.3d at 465. There, the "containers" referenced by the court were the disks the private party had

searched and the particular "items" were files the private party had not viewed on the disks.  Id.  Accordingly, the Fifth Circuit analogized the previously viewed disks to containers that had already been opened.  Id.  Similar "container" analysis was applied in United States v. Simpson, where the United States Court of Appeals for the Eleventh Circuit concluded the government did not exceed the prior private search even though the subsequent government search was a more thorough and time-consuming search of a box containing pornographic videos and magazines.  United States v. Simpson, 904 F.2d 607, 610 (11th Cir. 1990).  This is because the "box's contents had already been examined, their illicit character had been determined, and they were open for viewing" by the time government agents had arrived at the scene.  Id.  And in Bowman, the United States Court of Appeals for the Ninth Circuit held a government agent's search "permissible, and constitutional, to the extent that it mimicked the private search" conducted by the manager of a storage company.  United States v. Bowman, 215 F.3d 951, 963 (9th Cir. 2000).

Here, the CCA found that the military judge "incorrectly interpreted the law when he held that Detective [Rico's] search had to exactly mirror TSgt Roberts's search in order to be lawful."  United States v. Wicks, No. ACM 2013-08, 2013 CCA LEXIS 621, at *15-*16, 2013 WL 3336737, at *5 (A.F. Ct. Crim.

App. June 24, 2013) (unpublished).  Instead, the CCA concluded
that Detective Rico's viewing of the cell phone was "analogous
to examination of the computer disks in Runyan" where the cell
phone and its contents were "akin to a 'closed container.'"
Wicks, 2013 CCA LEXIS 621, at *16, 2013 WL 3336737 at *5.  In
its brief before this Court, the Government similarly analogizes
Appellant's cell phone to a singular closed container, i.e., one
of the disks searched by the private parties in Runyan.  In so
doing, it would treat all the data contained on Appellant's cell
phone as derivative of the same container.  Because TSgt Roberts
frustrated Appellant's expectation of privacy by reading some
texts -- thereby opening the container -- the Government argues,
she frustrated the expectation of privacy in all the texts, and
by that measure any other cell phone content.  Thus, the
Government contends the subsequent, more thorough analyses were
valid, as in Runyan.

Assuming without deciding that the Runyan court was correct
in determining that the "container" was the entire computer
disk, we nonetheless do not find the CCA's reliance on the
Runyan analysis persuasive in light of the facts of this case
and this particular phone.  The problem with applying
"container" metaphors is that modern computer technologies, such
as cell phones and laptops, present challenges well beyond
computer disks, storage lockers, and boxes.  Because of the vast

22

amount of data that can be stored and accessed, as well as the myriad ways they can be sorted, filed, and protected, it is not good enough to simply analogize a cell phone to a container. Moreover, modern cell phones have the capability to be linked to one's bank account, personal calendar, e-mails, financial portfolios, and home security systems. See Cotterman, 709 F.3d at 956; Charles E. MacLean, But, Your Honor, a Cell Phone is Not a Cigarette Pack: An Immodest Call for a Return to the Chimel Justifications for Cell Phone Memory Searches Incident to Lawful Arrest, 6 Fed. Cts. L. Rev. 37, 60 (2012). This is far more expansive than mere CDs or cardboard boxes. In fact, "[t]he potential invasion of privacy in a search of a cell phone is greater than in a search of a 'container' in a conventional sense" because a cell phone can provide access to a "vast body of personal data." Flores-Lopez, 670 F.3d at 805.

As such, the searches in the present case differ from the searches in Runyan and Simpson. In both of those cases, the items searched were static storage containers unlike a cell phone that can be linked to a vast amount of personal data, some readily accessible and some not. And unlike Jacobsen -- where the contents of the container were easily exposed -- the record reflects that the contents of Appellant's cell phone were not readily exposed or subject to examination. Instead, the Government had to send the cell phone to two different forensic

experts to extract and sort data and in doing so gathered a universe of information, including contacts. Further, contrary to Jacobsen, where the Supreme Court concluded there was no "'private' fact" at risk of being revealed by a chemical test that merely confirmed or negated the presence of one chemical component, Jacobsen, 466 U.S. at 123, in the present case the military judge found that the Government generally scrolled through a number of private texts. Later, the Government searched over 45,000 texts, including six deleted messages that would not have been viewable by the private actor. Unlike Jacobsen, many "private facts" of the Appellant were, in fact, revealed.

Thus, on the basis of the record in this case and with respect to this particular phone, we disagree with the CCA's application of the Runyan container analysis, noting that the Government's subsequent search of Appellant's cell phone was sufficiently distinct from the Runyan containers. In doing so, we conclude that the military judge did not abuse his discretion in finding that the Government failed to carry its burden that their searches did not exceed the scope of TSgt Roberts's private search. As a final point, we now consider whether the military judge erred in applying the exclusionary rule to this case.

E.  Exclusionary Rule and the Inevitable Discovery Exception

Having determined that the military judge did not err in finding the Government exceeded the scope of TSgt Roberts's private search in the conduct of its subsequent searches, we now consider whether the military judge erred in applying the exclusionary rule to this case.

The exclusionary rule is a judicially created remedy for violations of the Fourth Amendment.  Weeks v. United States, 232 U.S. 383 (1914), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643 (1961).  The rule applies to evidence directly obtained through violation of the Fourth Amendment as well as evidence that is the indirect product or "fruit" of unlawful police activity.  Wong Sun v. United States, 371 U.S. 471, 488 (1963).  "[S]uppression is not an automatic consequence of a Fourth Amendment violation," but turns on the applicability of specific exceptions as well as the gravity of government overreach and the deterrent effect of applying the rule.  United States v. Herring, 555 U.S. 135, 137 (2009).  Evidence that would otherwise be suppressed is admissible if it meets a limited number of exceptions to the exclusionary rule, such as (1) evidence can be derived from an independent source; (2) it has an "attenuated link to the illegally secured evidence"; or (3) it "inevitably would have been discovered during police investigation without the aid of the illegally obtained

25

evidence." Runyan, 275 F.3d at 466 (quoting United States v. Miller, 666 F.2d 991, 995 (5th Cir. 1982) (internal citations and quotation marks omitted)). See also M.R.E. 311(b)(2).

We turn first to inevitable discovery. For this to apply in this case, the Government had to demonstrate by a preponderance of the evidence that "when the illegality occurred, the government agents possessed, or were actively pursuing, evidence or leads that would have inevitably led to the discovery of the evidence" in a lawful manner. United States v. Dease, 71 M.J. 116, 122 (C.A.A.F. 2012) (quoting United States v. Kozak, 12 M.J. 389, 394 (C.M.A. 1982)). "[M]ere speculation and conjecture" as to the inevitable discovery of the evidence is not sufficient when applying this exception. United States v. Maxwell, 45 M.J. 406, 422 (C.A.A.F. 1996). This exception is only applicable "[w]hen the routine procedures of a law enforcement agency would inevitably find the same evidence." United States v. Owens, 51 M.J. 204, 204 (C.A.A.F. 1999). Moreover, the inevitable discovery doctrine "'cannot rescue evidence obtained via an unlawful search simply because probable cause existed to obtain a warrant when the government presents no evidence that the police would have obtained a warrant.'" Wallace, 66 M.J. at 11 (Baker, J., concurring in the result) (quoting United States v. Allen, 159 F.3d 832, 842 (4th Cir. 1998)).

In the present case, the Government argues that it would have been able to determine the trainees with whom Appellant had an inappropriate relationship by using the information provided by TSgt Roberts during the first interview and that these names alone would have inevitably led the Government to the text messages subsequently found on Appellant's cell phone. This may be so. But the military judge found that the Government did not meet its burden of showing such an inevitable discovery. The military judge also concluded that he could not determine whether the text messages seen by Detective Rico were the same as those seen by TSgt Roberts. Nor did the military judge, in his findings, indicate whether the number of messages seen by Detective Rico between Appellant and Wade and Appellant and Benoit paralleled those seen by TSgt Roberts or varied in a legally significant manner.

In addition, the military judge concluded that "the Government made no effort to secure a warrant or even explore the possible ramifications of searching a phone which law enforcement was clearly on notice contained personal information of the accused and was unlawfully taken." Although Detective Rico dutifully consulted with the legal office, no efforts were made to secure search authority even when Bexar County officials inquired about the basis for conducting an extraction. The military judge continued that "the Government has not met its

27

burden of showing that the multiple, unlimited, general searches and examinations of the cell phone would have been inevitably discovered by lawful means." Instead, the Government proceeded in conducting multiple warrantless searches: first of the SIM card, then of the cell phone by the Bexar County Sheriff's Office, and finally of the phone by Global CompuSearch.

The record, to the extent it is developed, supports these conclusions. Because the record does not indicate what Detective Rico reviewed and the extent to which it mimicked TSgt Roberts's own review, we cannot know the universe of what the Government may have inevitably discovered in the course of investigation absent the additional searches of Appellant's cell phone. Instead, the record reflects that the Government's next investigative step following Rico's review of the phone was to send the phone for additional search and analysis. Nor does the Government present compelling evidence that they would have sought a warrant; on the contrary, Detective Rico conceded that it was not her practice to obtain a search authorization. Further, on three separate occasions Detective Rico consulted the legal office without subsequently seeking a search authorization. Finally, there is no indication Detective Rico was independently pursuing leads from her interview of TSgt Roberts without relying on or benefiting from the cell phone search. Detective Rico did gather prior recruit rosters, but

she did not contact or interview prior recruits before first gathering and reviewing the cell phone search data.  On this record, the Government has not shown that the military judge erred in concluding that the Government did not meet its burden of demonstrating that the routine procedures of the law enforcement agency would inevitably find the same evidence.

In the absence of the inevitable discovery exception, we turn to the military judge's decision to apply the exclusionary rule.  The exclusionary rule "applies only where it 'result[s] in appreciable deterrence'" for future Fourth Amendment violations and where the "benefits of deterrence must outweigh the costs."  Herring, 555 U.S. at 141 (internal citations omitted).

Here, three factors favor exclusion.  First, the Government's search of Appellant's cell phone exceeded TSgt Roberts's private search.  Where the military judge found that Roberts's search was limited to a few texts, photographs, and one video, the Government searches included tens of thousands of text images, including some deleted texts that were not -- and could not have been -- viewed by TSgt Roberts.  Second, the Government conducted its searches in reliance upon legal advice.  Three times Detective Rico consulted the relevant legal office with probable cause in hand, and three times the Government proceeded to search Appellant's cell phone without benefit of a

search authorization.  Further, Detective Rico testified that it was not her practice to seek search authorization in such contexts.  Finally, the Government ordered the most exhaustive analysis of Appellant's cell phone during trial while the issue of Appellant's Fourth Amendment rights was being litigated before the military judge.[4]

As a result, we do not take issue with the military judge's decision to apply the exclusionary rule to the direct and indirect evidence that he determined to be derived from the Government's unlawful searches of Appellant's cell phone.

### CONCLUSION

We conclude that the military judge did not abuse his discretion in finding that the Government failed to carry its burden to show that the Government searches did not exceed the scope of the private search.  As such, we hold that the military judge did not err in excluding the evidence obtained from the cell phone as a result of the Government's searches.

---

[4] As an additional matter, the Military Rules of Evidence proscribe that evidence obtained from the government's unlawful search or seizure is inadmissible if two conditions are met: (1) the accused makes a timely motion to suppress and (2) the accused had a reasonable expectation of privacy, a legitimate interest in the property seized, or other legal grounds to object.  M.R.E. 311(a)(1)-(2).  Here, Appellant made a timely motion, meeting the first condition.  And Appellant had a reasonable expectation of privacy as well as a legitimate interest in his cell phone.  On this interlocutory record, both conditions are met and the evidence obtained from the Government's search is inadmissible.

Accordingly, the decision of the United States Air Force Court of Criminal Appeals is reversed and the record of trial is returned to the Judge Advocate General of the Air Force for further proceedings.

United States v. Wicks, No. 13-6004/AF

STUCKY, Judge (concurring in part and dissenting in part):

I concur that the Government's successive searches, forensic and otherwise, of Appellant's iPhone clearly exceeded the scope of the original private search, and that the results of those searches must be excluded from evidence.  While the full extent of the private search is not clear, the military judge found that it revealed text messages from "D. Wade" and "Benoit."  United States v. Wicks, __ M.J. __, __ (6) (C.A.A.F. 2014).  I believe that the Government has carried its burden of showing that these messages were within the scope of the initial private search, and I would hold that they are therefore admissible at trial.

In all other respects, I concur in the majority opinion.