*This opinion is subject to revision before publication.*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

—————————

**UNITED STATES**
Appellee

**v.**

**Adalberto BRINKMAN-CORONEL, First Lieutenant**
United States Army, Appellant

**No. 24-0159**
Crim. App. No. 20220225

Argued January 15, 2025—Decided May 28, 2025

Military Judge: Michael E. Korte

For Appellant: *William E. Cassara*, Esq. (argued); *Captain Robert W. Duffie* and *Julie Caruso Haines*, Esq. (on brief); *Major Justin L. Watkins*.

For Appellee: *Captain Anthony J. Scarpati* (argued); *Colonel Richard E. Gorini* and *Major Lisa Limb* (on brief); *Major Chase C. Cleveland*.

Judge SPARKS delivered the opinion of the Court, in which Chief Judge OHLSON, Judge MAGGS, Judge HARDY, and Judge JOHNSON joined.

—————————

Judge SPARKS delivered the opinion of the Court.

A military judge sitting as a general court-martial convicted Appellant, contrary to his pleas, of attempted sexual assault of a child who has attained the age of twelve years, attempted sexual abuse of a child, absence from place of duty, communication of indecent language, two specifications of wrongful possession of child pornography, and three specifications of wrongful distribution of child pornography, in violation of Articles 80, 86, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 886, 934 (2018). The military judge sentenced Appellant to be dismissed from the service and to be confined for nine years and ten days. The convening authority took no action on the findings and affirmed the sentence. On appeal, the United States Army Court of Criminal Appeals (ACCA), in a divided opinion, affirmed Appellant's conviction.

The first granted issue requires us to decide whether the "lower court erred in finding that the military judge did not abuse his discretion when he failed to recuse himself from Appellant's court-martial for the appearance of bias." We agree with the lower court that the military judge did not abuse his discretion when he denied the motion to recuse himself. The second granted issue requires us to decide whether the "military judge abused his discretion when he denied the motion to suppress evidence discovered from the search of Appellant's 'vacuum phone' and all derivative evidence." While there may be questions about the theory of authority the military judge applied, we conclude that the evidence was admissible under a separate theory, and, as such, the military judge did not abuse his discretion. We therefore affirm the decision of the ACCA, which affirmed the findings and sentence in this case. *United States v. Brinkman-Coronel*, No. ARMY 20220225, 2024 CCA LEXIS 131, at \*26, 2024 WL 1460894, at \*9 (A. Ct. Crim. App. Mar. 22, 2024) (unpublished).

## I. Background

Appellant was stationed in Hawaiʻi and pending potential administrative separation from the Army for alleged

cocaine use. In preparation for said separation, Appellant's husband, DBC, had relocated to Michigan to prepare for their life after the Army. During this time apart, Appellant contacted an undercover law enforcement agent, who was posing as a fourteen-year-old boy named "Skyler," on a dating application. When "Skyler" informed Appellant he was fourteen, he asked if Appellant was upset. Appellant replied, "I'm not and I'd like to kiss you." Appellant then blocked "Skyler" on the application. However, he later decided to reestablish contact.

After unblocking "Skyler," Appellant initially told "Skyler" that "Skyler" was not supposed to be on the application; however, the conversation turned sexual, and Appellant arranged to meet "Skyler" the next day. After Appellant arrived at the agreed upon location, Army Criminal Investigative Division (CID) agents apprehended him and seized his phone. A military magistrate denied CID's verbal request to search the phone for evidence of child pornography. The commander of Joint Base Pearl Harbor-Hickam later authorized a search of the seized phone.

Investigators then released Appellant into the custody of his company commander, Captain (CPT) RZ, who placed conditions on his liberty. These conditions required, in part, that Appellant check in with CPT RZ on a regular schedule. During this time period, Appellant sent four messages to DBC telling him to immediately come to Hawai'i, find Appellant's phone located inside a vacuum cleaner (vacuum phone), and look for videos in a specific folder on the phone. Hours later, and before DBC saw the first messages, Appellant sent DBC a message saying "please disregard the previous messages. I had a crisis. I'm better now." After reading these messages, DBC called Appellant, and after the call DBC said that Appellant had allayed his concerns and did not make the trip to Hawai'i or notify any authorities.

The following morning, Appellant failed to appear at either staff duty or morning formation. CPT RZ went to Appellant's on-base home, but Appellant did not answer the door. After speaking with DBC, CPT RZ was fearful for

Appellant's well-being. While on the phone, DBC gave CPT RZ permission to enter the home he shared with Appellant. DBC also gave CID broad authority to "do what they had to do to find [his] husband." An initial search of the home failed to uncover any information regarding Appellant's whereabouts. Later that same day, after CID agents searched the residence for nearly an hour, DBC informed CID agents about the "vacuum phone." With his assistance, the agents were able to access the phone which was found inside the vacuum. A quick manual search of the device uncovered "goodbye" messages Appellant left for his loved ones. CID had not informed DBC that it had already seized Appellant's primary phone, thus DBC was under the impression that the phone in question was Appellant's everyday phone. The agent at the scene said he did not search beyond the farewell messages because he did not want to "alter too much data" so that the phone could be reviewed in the most "forensically sound" manner.

That day, while examining the phone, a CID digital forensic examiner found images and videos of suspected child pornography. After a military magistrate's search authorization, additional searches of this phone revealed that Appellant distributed videos containing child pornography and chatted with others about his interest in young boys.

At trial, defense counsel moved to suppress the evidence found on the vacuum phone and all derivative evidence. After extensive testimony, the military judge concluded that DBC gave "broad consent . . . to CID concerning the house and many items in it," and that DBC had "common authority" over the vacuum phone such that he could give consent to access the entire phone. The military judge held that Appellant's "disregard" message did not revoke consent and that DBC "was never told he could not come to the house or unlock and view the phone." The military judge concluded that CID had not exceeded DBC's consent because DBC, possessing actual authority to consent, gave a broad search authorization and Appellant's behavior had created a sense of emergency.

At Appellant's arraignment, prior to inviting either side to inquire whether there were grounds to challenge his qualifications to sit as military judge, the military judge sua sponte disclosed that he served as the "special victim prosecutor for Hawaiʻi from 2018 until approximately May of 2021." In that capacity, he worked with both the detailed trial and defense counsel and assisted them with investigations involving sexual assault, child abuse, and domestic violence. The military judge also worked professionally with the assistant trial counsel who was a special victim's counsel from 2020 until 2021. However, he had not supervised any of the three counsel and classified his relationship with them as "professional." The military judge clarified that he "[knew] nothing of [the] case except what's been provided to [him] by counsel through the course of this court-martial referral process. And . . . just to be sure, [he] checked files." During voir dire, the military judge repeatedly affirmed that he knew nothing of the case. The military judge volunteered that, from the context of Charge I, he assumed the charge was related to Operation Keiki Shield.[1] Although Appellant's misconduct occurred toward the end of the military judge's tenure as special victim prosecutor (SVP), he was not present in any meetings regarding Appellant's case. The military judge was confident that this was so because he kept files on cases that he reviewed and because he was "sectioned off" during this time, presumably to avoid conflicts of interest. The military judge confirmed that neither trial counsel nor any other member of the government sought his advice on Appellant's case when he was the SVP.

Trial defense counsel sought to disqualify the military judge under Rule for Courts-Martial (R.C.M.) 902 (2019 ed.), first arguing that the military judge's "impartiality might reasonably be questioned just based off of [his] background as an SVP . . . during a timeframe in which some of this misconduct did arise." Second, Appellant argued the

---

[1] Operation Keiki Shield is a multiagency undercover operation targeting child sexual predators in Hawaiʻi.

military judge should be disqualified based upon his relationships and work with both trial counsel. The military judge, without explaining his rationale, denied Appellant's challenge. Shortly thereafter, Appellant elected to be tried by the military judge alone.

On appeal, the ACCA gave the military judge's recusal determination little deference because he failed to provide his rationale. The lower court, nonetheless, found that the military judge did not abuse his discretion by not disqualifying himself from adjudicating Appellant's case. *Brinkman-Coronel*, 2024 CCA LEXIS 131, at *14-17, 2024 WL 1460894, at *6. The ACCA based its decision primarily on the military judge's forthcoming responses during voir dire, demonstrating that he had no prior knowledge of or involvement with Appellant's case. *Id.*, 2024 WL 1460894, at *6.

Furthermore, the lower court concluded that the military judge had not erred when he denied the suppression of evidence discovered from a search of Appellant's phone. The lower court reasoned that Appellant gave DBC common authority over the vacuum phone by providing its location, the password, and directing him to the goodbye messages. *Id.* at *18-20, 2024 WL 1460894, at *7.

## II. Discussion

Beginning with Issue I, we hold that the military judge did not abuse his discretion. Turning to Issue II, we hold that DBC had apparent authority over the vacuum phone, and, as such, the search was reasonable. Thus, the military judge did not abuse his discretion in admitting the evidence.

## A. The military judge did not abuse his discretion by not recusing himself from this court-martial

"An accused has a constitutional right to an impartial judge." *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001) (internal quotation marks omitted) (quoting *United States v. Wright*, 52 M.J. 136, 140 (C.A.A.F. 1999)). R.C.M. 902 implements this rule and "provides two bases for

disqualification of a military judge." *United States v. Martinez*, 70 M.J. 154, 157 (C.A.A.F. 2011). The first basis is a military judge's duty to "disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." R.C.M. 902(a). The second basis involves the specific enumerated circumstances requiring disqualification under R.C.M. 902(b). "There is a strong presumption that a military judge is impartial in the conduct of judicial proceedings." *United States v. Foster*, 64 M.J. 331, 333 (C.A.A.F. 2007).

This Court reviews a "military judge's disqualification decision . . . for an abuse of discretion." *United States v. Uribe*, 80 M.J. 442, 446 (C.A.A.F. 2021) (citation omitted) (internal quotation marks omitted). "A military judge's ruling constitutes an abuse of discretion if it is arbitrary, fanciful, clearly unreasonable or clearly erroneous." *Id.* (citation omitted) (internal quotation marks omitted). This Court cannot find an abuse of discretion if it "merely would reach a different conclusion." *Id.* (citation omitted) (internal quotation marks omitted).

Appellant made no claim of actual bias before this Court, and there is nothing in the record that would compel the military judge to recuse himself from Appellant's court-martial under R.C.M. 902(b).[2] The question before us is whether the military judge should have recused himself under R.C.M. 902(a). The appearance of bias is judged objectively, and this Court considers "[a]ny conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned." *Hasan v. Gross*, 71 M.J. 416, 418 (C.A.A.F. 2012) (first alteration in original) (internal quotation marks omitted) (quoting *United States v. Kincheloe*, 14 M.J. 40, 50 (C.M.A. 1982)). "[W]hen a military judge's impartiality is challenged on appeal, the test

---

[2] At the ACCA, Appellant argued that the military judge should have recused himself for both actual and apparent bias. The ACCA incorrectly stated that Appellant alleged only the appearance of bias before the lower court.

is whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt by the military judge's actions." *United States v. Tapp*, 85 M.J. 19, 27 (C.A.A.F. 2024) (alteration in original) (internal quotation marks omitted) (quoting *Martinez*, 70 M.J. at 157-58).

Appellant argues that the military judge should have recused himself because Appellant's charged offenses occurred during the military judge's tenure as the SVP and in the same jurisdiction where he served as the "subject matter expert for all of Hawai'i." This provided the military judge, or so Appellant argues, with a unique perspective regarding "tactics and techniques" used by law enforcement.

We disagree with Appellant that the timing of his offenses give rise to concern about the appearance of bias. Appellant's conduct did not come to light until he tried to meet a fictitious fourteen-year-old for sex in April 2021. This is also when law enforcement first discovered that Appellant potentially possessed images and videos of child pornography dating back to May 2019. By this time, the military judge, still in his role as SVP, had already started the process of transitioning to the bench. As a part of this process, he sectioned himself off from investigations. During voir dire, the military judge stated that he had not worked on Appellant's case in any capacity.

Further, Appellant makes the argument that the military judge's recusal was warranted based on his supervisory prosecutorial position before joining the bench. In essence then, Appellant invites this Court to apply the vertical imputation standard examined in *United States v. Jones*, 55 M.J. 317, 319 (C.A.A.F. 2001), under which the knowledge and actions of subordinates are attributed to their superiors. In *Jones*, this Court declined to apply the vertical imputation standard where an appellate military judge serving on the United States Navy-Marine Corps Court of Criminal Appeals had previously served as the director of the Government Appellate Division when the appellant's appeal was docketed with the lower court. 55 M.J.

at 318. In that case, we reasoned that the appellate military judge's recusal was not warranted where his unrebutted affidavit demonstrated that "he had no actual involvement with [that] case during his tenure at the Appellate Government Division." *Id.* at 320. As in *Jones*, Appellant in this case has not provided any indication that the military judge played any role in Appellant's case before his ascension to the bench, and Appellant has identified no other basis that warranted the military judge's recusal. If we were to say that the military judge in this case was implicitly biased, it is hard to picture an instance in which any military judge who played a role in the military justice system in a judicial circuit could hear a case in that circuit that originated in their time before the judiciary. Essentially, Appellant is asking us to adopt a per se implied bias standard. However, that would stretch R.C.M. 902(a) beyond its purpose, and, for that reason, we reject it.

Thus, we agree with the ACCA that the military judge did not abuse his discretion when he did not recuse himself from Appellant's court-martial for the appearance of bias.

## B. The military judge did not abuse his discretion when he denied the motion to suppress evidence

"Property or evidence may be seized with consent consistent with the requirements applicable to consensual searches." Military Rule of Evidence 316(c)(3). Voluntary consent from an individual possessing authority over the property in question provides an exception to the Fourth Amendment protections against warrantless search. *See United States v. Weston*, 67 M.J. 390, 392 (C.A.A.F. 2009). A third party can consent when they share "common authority over the property." *Id.* (citing *United States v. Matlock*, 415 U.S. 164, 171 (1974)). "The authority which justifies the third-party consent does not rest upon the law of property, . . . rather on mutual use of the property by persons generally having joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n.7.

Even if a third party does not possess the actual authority to consent, the search may still be lawful if law

enforcement officials reasonably believed the third party could consent—that they had apparent authority to consent. *See Illinois v. Rodriguez*, 497 U.S. 177, 185-87 (1990). However, apparent authority only justifies a search if "no facts . . . tended to show that the [law enforcement] agents should have reasonably known that the [property] was the exclusive property" of someone other than the consenting third party. *United States v. Gallagher*, 66 M.J. 250, 252 (C.A.A.F. 2008). The standard, as always is the case under the Fourth Amendment, is "reasonableness." *See United States v. Shields*, 83 M.J. 226, 232 (C.A.A.F. 2023).

"This Court reviews a military judge's ruling on a motion to suppress evidence for an abuse of discretion." *Id.* at 230 (citation omitted) (internal quotation marks omitted). When reviewing a "military judge's denial of a motion to suppress for an abuse of discretion, [this Court views] the evidence in the light most favorable to the prevailing party." *United States v. Eugene*, 78 M.J. 132, 134 (C.A.A.F. 2018) (citation omitted) (internal quotation marks omitted). "When reviewing a lower court's decision on a military judge's ruling, we 'typically have pierced through that intermediate level and examined the military judge's ruling, then decided whether the Court of Criminal Appeals was right or wrong in its examination of the military judge's ruling.'" *Shields*, 83 M.J. at 230 (quoting *United States v. Blackburn*, 80 M.J. 205, 211 (C.A.A.F. 2020)).

The Supreme Court has recognized that cell phones occupy a unique place in contemporary society. *See Riley v. California*, 573 U.S. 373, 403 (2014) ("Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life.'" (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886))). Just as people have the right to be "secured in their persons, houses, papers and effects," pursuant to the Fourth Amendment, people also have a reasonable expectation of privacy in their cell phones. *United States v. Wicks*, 73 M.J. 93, 98-99 (C.A.A.F. 2014). Cell phones "may not be searched without probable cause and a warrant unless the search . . . falls within one

of the recognized exceptions to the warrant requirement."
*Id*. at 99.

The military judge in this case found that DBC's common authority over the dwelling extended to the vacuum phone. There exists some uncertainty about whether DBC had actual authority to consent to a search of the vacuum phone in part because of Appellant's contention that he revoked DBC's access to the phone. However, there is no doubt that DBC's common authority over his and Appellant's home gave him the apparent authority to consent to the search.[3]

A search satisfies the Fourth Amendment—even though the person lacks the actual authority to consent— if " 'the facts available to the officer at the moment [would] warrant a [person] of reasonable caution [to believe] that the consenting party had authority over the premises' or effects." *Gallagher*, 66 M.J. at 253 (quoting *Rodriguez*, 497 U.S. at 188) (first and third alterations in original). The scope of apparent authority depends on whether it was objectively unreasonable under the circumstances for law enforcement to believe that the consent extended to a particular container on the premises, and the container could reasonably hold the object of the search. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991). While the scope of consent to search may be limited by the consenter, if consent "would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for

---

[3] Unlike actual authority, apparent authority exists when "the facts available to the officer at the moment" would lead a reasonable officer to believe that a party had actual authority. *Rodriguez*, 497 U.S. at 188. Because Appellant's purported revocation of DBC's access to the vacuum phone was not immediately and clearly conveyed to the CID agents conducting the search, "it cannot reasonably have influenced [their] beliefs regarding whether [DBC] possessed apparent authority." *United States v. Groves*, 470 F.3d 311, 319 (7th Cir. 2006). Moreover, because the purported recission of authority was equivocal, Appellant's argument fails on this ground as well. *See Eugene*, 78 M.J. at 134.

requiring a more explicit authorization." *Id.* at 252. These cases stand for the proposition that absent evidence showing that an officer should have known the third party did not have the authority to consent, the search is reasonable.

Although the vacuum phone was Appellant's exclusive property, the CID agents had reason to believe that Appellant had given DBC permission to authorize a search of the vacuum phone. In *Gallagher*, the issue was whether the appellant's spouse's common authority to consent to a search of their joint residence extended to an unmarked, unlocked, briefcase kept in a common area of the home. 66 M.J. at 251-52. Quoting the military judge's conclusion, this Court noted that the officer "possessed no facts that reasonably should have caused him to believe the briefcase was the exclusive domain of the appellant. In fact, it would have been just as reasonable to conclude the briefcase was primarily used by Mrs. Gallagher." *Id.* at 254 (internal quotation marks omitted). This Court determined that the appellant's wife had common authority over the home, which extended to apparent authority over the briefcase. *Id.*

Here, Appellant and DBC did not share a cell phone plan, the cell phone was hidden away in a vacuum, and DBC was not aware that the vacuum phone was different from Appellant's primary phone. However, the searching officer was aware of only some of this information. All the officer knew at that moment was that DBC identified the location of the vacuum phone and had the passcodes necessary to access it. Thus, as in *Gallagher*, DBC had the apparent authority to consent to a search of the vacuum phone.

The question still remains as to whether the Government exceeded the scope of its authority in conducting its search of the phone. As established above, DBC had apparent authority to consent to the search and provided CID with "broad consent regarding the time, place, and manner of the CID search." *Brinkman-Coronel*, 2024 CCA LEXIS 131, at *22, 2024 WL 1460894, at *8. The only limiting term was that the search must be related to actions intended to locate Appellant.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness." *Jimeno*, 500 U.S. at 251. While the scope of consent can be limited by the consenter, if said consent "would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." *Id* at 252. Appellant's husband instructed CID to take any action necessary to find Appellant. Thus, CID had broad apparent authority to search the vacuum phone as it could have contained clues as to Appellant's travel or communications, which could be used to help locate Appellant.

In *Shields*, the appellant surrendered his cell phone to military law enforcement pursuant to a search authorization. 83 M.J. at 228. The search authorization provided access to "all location data stored on [appellant's] phone or within any application within the phone for 23 Dec [20]18." *Id*. (second alteration in original). The analyst organized the images in a "thumbnail" format and a "table view" format.[4] *Id*. at 229. His intent was to sort the images and filter by the date range described in the warrant. *Id*. "However, before he could apply a date filter to isolate images from December 23, [2018], he immediately noticed a thumbnail image of what he believed to be a depiction of child pornography." *Id*. This Court held that "when it comes to cell phones and computers, although one search method may be objectively 'better' than another, a search method is not unreasonable simply because it is not optimal." *Id*. at 232. The analyst "was not rummaging through [a]ppellant's phone, even though the defense expert pointed to a different—and perhaps even better—way to conduct the search." *Id*.

Like *Shields*, the forensic analyst's search of the vacuum phone was broadly limited to anything that could help in locating Appellant. He located the apparent child pornography "in the same pane" or "next to . . . the suicide

---

[4] Of note, in both *Shields* and the present case, the forensic analysts were using the software program Cellebrite.

videos" that he was authorized to view. While it may have been wiser for the forensic analyst to further limit the scope of his search in some manner, this Court's precedent does not find this disqualifying.

Thus, while we diverge slightly from the military judge's reasoning, we agree with the ACCA that the military judge did not abuse his discretion.

### III. Conclusion

The granted issues are answered in the negative. The decision of the United States Army Court of Criminal Appeals is affirmed.